STATE *v.* SAMUEL F. HARRIS ; STATE *v.* MERRITT B. MOR-
GAN ; AND STATE *v.* ROBERT W. BENNETT AND OTHERS.

*Village Corporation. Elections. Voter. Waiver.*

On hearing of a petition brought by a State's attorney of his own motion, under No.
74, Sts. 1876, for a writ of *quo warranto* to oust an alleged usurper of the office of
moderator for an incorporated village, it appeared that the village charter provided
that none should be entitled to vote at the village meetings who had not " resided
for one year within the bounds of the village", and that at the meeting at which
the election under color of which the respondent took office was had, the respond-
ent was voted for by one who had formerly resided within the village for many
years, but who moved out of it, although not out of the town, two years before,
and did not return until five months before, the meeting. The meeting was held
on April 7. *Held,* that the vote so cast was not lawful.

Seven ballots were cast for the opposing candidate, on which were printed the names
of candidates for certain other village offices and of the offices for which they
were respectively nominated, but they were rejected and not counted. *Held,* that
they should have been counted.

After the respondent was declared elected, he took the moderator's chair, whereupon
the assembled voters proceeded in the election of a clerk, trustees, &c. *Held,* that
by thus proceeding they did not, under the circumstances, *q. v.,* acquiesce in the
election of the respondent, and that, if they had acquiesced, such acquiescence
would not prejudice the petition, as, in such a proceeding, not they alone, but all
the citizens of the State, were represented and interested.

In proceeding with the election of clerk and trustees, notwithstanding the village char-
ter provided that they should be elected " by ballot, if called for", and notwith-
standing a ballot was called for in various ways, among others by motion made and
seconded, the moderator, in pursuance of a motion and voice vote of *yea* and *nay*
by acclamation, appointed a committee to nominate candidates for those and other
offices. On coming in of the report of the committee, it was moved and seconded
that the report be accepted and adopted. Vote was taken thereon as before, re-
sulting in the affirmative, whereupon the moderator declared the report accepted
and adopted and that the several candidates named therein were elected. After
the report was made, and before the motion for its acceptance and adoption was
put, calls for an election by ballot were made by legal voters, and heard and under-
stood by the moderator. *Held,* that under the charter it was the right of the indi-
vidual voter to have such ballot on demand; and that it would not avail against
such right that a mode of election such as was here adopted had been used in for-
mer elections, as such right was not subject to loss by *non-user.*

Manner of conducting such elections commented on.

THESE were petitions by the State's attorney of Bennington
County, on his own motion, under No. 74, Sts. 1876, for writs of
*quo warranto* against the respondents for usurping and exercis-

ing certain offices of the village of Bennington. The petitions were made returnable to the Supreme Court for Washington County, at its August Term, 1879, and were at that term transferred to the Supreme Court for Bennington County, and ordered to be heard at the General Term, 1879, at which term they were heard together.

The petition in the first-named cause, after alleging the incorporation of the village of Bennington in 1849, the subsequent continued existence of the corporation, and due warning for an annual meeting of said voters on April 7, 1879, for the purpose of electing a moderator, a clerk, seven trustees, &c., alleged that " a large number of the legal voters " of said village assembled at the time and place appointed, and with them " a large and tumultuous crowd of persons " who were not legal voters, who " by means of loud noise and disorderly conduct made it impossible for the deliberations of the meeting to proceed and for the vote of the legal voters to be taken in any practicable manner"; that a ballot was then and there taken for a moderator to preside at all meetings for the year ensuing, the moderator then presiding appointing two tellers ,who proceeded to canvass the meeting for votes, the legal voters " and such other persons as saw fit so to do " casting their ballots " into two hats carried by said tellers, with but little check or scrutiny," all of which was " against the protest then and there made of legal voters in said meeting"; that the respondent and one John V. Carney were candidates for said office ; that many fraudulent and illegal votes were cast for the respondent,—numerous persons voting for him more than once at the same ballot, numerous ballots being cast by persons who were not legal voters, and in numerous instances the same person casting more than one ballot at one time,—and that many such votes were then and there counted for the respondent, against the protest of legal voters then present ; that said Carney in fact received a large majority of the legal votes then cast, and was duly elected ; that at the close of said balloting the ballots were counted, and it appeared and was publicly announced that said Carney had received one hundred and ninety or more of the votes so cast, and that the respondent had received only one hundred

and eighty-nine thereof; that the moderator then presiding declared that the respondent was elected, for that there were annexed to certain of the votes for said Carney votes for certain other persons for certain other offices; that the respondent then took the chair " amid great confusion", said Carney being prevented from doing so by " the violent demonstrations of certain disorderly persons, who gathered around him and threatened him with injury, if he should attempt " to do so; and that the respondent thereafterwards used and exercised, and still continued to use and exercise,. the office of moderator, &c., without any legal election, right, or warrant whatever. Prayer, among other things, that the respondent be ousted, and that judgment be rendered on the right of said Carney to said office.

The petition in the second cause, after alleging incorporation, warning of the meeting, &c., like the petition in the first cause, alleged that the act of incorporation provided that at every annual meeting the corporation should by ballot, if called for, elect for the ensuing year a clerk, seven trustees, &c.; that at said meeting, after Harris had taken his place as moderator thereof, and while he was acting as such, a ballot for the other officers was " duly, properly, and repeatedly called for by legal voters in large numbers," by formal motions duly seconded and otherwise; that the moderator " refused and neglected to put or entertain any motion for the election of such officers by ballot," and " refused and neglected to direct any ballot to be taken," and " refused to receive ballots for such officers then and there tendered to him by legal voters," but instead thereof " appointed a committee," who " reported the names of certain persons as candidates " for said offices, and among them the name of this respondent as a candidate for the office of clerk; that that report " was thereupon declared accepted," and the meeting adjourned without taking any further action in the premises; and that the respondent thereafterwards used and exercised and still continued to use and exercise the office of clerk, &c., without any legal election, &c. *Prayer*, among other things, that the respondent be ousted.

The petition in the third-named cause was substantially like that in the second, except that it was directed against other par-

ties, the respondents therein, whose names the nominating committee were alleged to have reported as names of candidates for the offices of trustees.

The answer to the first-named petition admitted the incorporation of the village of Bennington and the warning for, and holding of, the meeting at the time and place alleged; denied the material allegations of the petition as to alleged voting; denied that Carney received a majority of the legal votes, admitted the rejection of certain ballots for the reason that certain other names were printed on them, but alleged that had they been received and counted, the respondent would still have had a majority; admitted taking the chair, and afterwards presiding as moderator of said meeting; denied that Carney was prevented from taking the chair as alleged; admitted the exercise of the office of moderator, but denied that it was without legal election, warrant, &c.; and alleged acquiescence in his election and subsequent official acts on the part of the voters.

The answer to the second-named petition also admitted the incorporation, the warning for the meeting, &c.; admitted that by the act of incorporation the clerk, &c., should be elected by ballot, if called for; alleged due election of moderator; denied that a ballot for the other officers was duly and properly called for, or that the moderator neglected and refused to "put or entertain any motion" "properly and lawfully made and seconded" for election by such means; alleged that immediately after the moderator took his place as alleged, a motion was duly made and seconded that a committee be appointed by the chair to nominate candidates, that that motion was duly put and carried, that the moderator thereupon appointed a committee of legal voters, who by their report nominated the respondent as a candidate for the office of clerk, that the report of the committee was on motion duly accepted and adopted, whereupon the moderator announced the respondent's election, and that the respondent then accepted said office, and entered upon its duties; admitted that it might be true that some one or more offered their ballots, claiming a right to vote by ballot, but alleged on information and belief that, if so, there was then pending the motion for appointment of said com-

mittee ; admitted use and exercise of said office ; denied the lack of election, warrant, &c. ; and alleged acquiescence on the part of the other village officers and the legal voters.

The answer of four of the respondents to the petition in the third-named cause was in substance like the last preceding, except in the persons alleged to have been nominated by the committee, and admitted to have exercised office, &c. The answer of the three remaining respondents was different only in being upon information and belief as to the proceedings at the meeting in question.

Testimony was taken on both sides in all of the causes, and the alleged act of incorporation was duly exhibited by the petitioner. Section 2 of the act of incorporation provided that "none but inhabitants qualified by law to vote in town meetings" in the town, and who had resided for one year within the bounds of the village, should be entitled to vote at village meetings. Section 3, so far as material, was as follows: "At every annual meeting said corporation shall, by ballot, if called for, elect for the ensuing year, and until their places are filled by due elections, a moderator . . . a clerk . . . seven trustees", &c. The respondents also exhibited copies of several newspapers of the date of April 9, 1879,—*The New York Sun*, *The New York Times*, *The Boston Journal*, and *The Springfield Republican*. The testimony in all of the causes tended to show that the meeting was held at the time and place alleged, and the testimony taken on the part of the petitioner tended to support the allegations of the petitions, while that taken on the part of the respondents tended in some degree to rebut it. The testimony taken in the first-named cause tended particularly to show that one David Carpenter, who was present and voted for the respondent Harris, moved out of the village, but not out of the town of Bennington, on April 2, 1877, after having resided there many years, and did not return till early in November, 1878. It also tended to show that at least seven ballots were cast for Carney on which were printed, besides Carney's name and the name of the office for which he was nominated, the names of candidates for all of the other offices, together with the names of the offices for which

they were respectively nominated; and that those ballots were rejected in counting the votes. The testimony in all of the cases further tended to show that after respondent Harris was declared elected moderator, and took the chair, the assembled voters, amid much noise and confusion, and after loud and repeated calls for a ballot, proceeded in the election of a clerk, trustees, &c., in the manner indicated in general by the petitions and answers. The material facts appear from the opinion of the court.

*J. K. Batchelder*, State's attorney, and *Gardner & Harmon*, for the State, upon the question as to whether *quo warranto* was the proper process, cited *Commonwealth* v. *Athearn*, 3 Mass. 285; *First Parish in Sudbury* v. *Stearns*, 21 Pick. 148; *People* v. *Van Slyck*, 4 Cow. 297, and cases *passim*. To the point that the court could go behind a certificate of election they cited *People* v. *Van Slyck, supra; People* v. *Richardson*, 4 Cow. 97; *Attorney General* v. *Ely*, 4 Wis. 438, and cases *passim*. To the point that the ballots having thereon names of candidates for other offices should have been counted, they cited *People* v. *Cicott*, 16 Mich. 283; *People* v. *Ferguson*, 8 Cow. 102, and cases *passim*.

*Kittredge Haskins*, for the respondents.

What mean the words, " shall by ballot, if called for, elect for the ensuing year ", &c. ? The Legislature intended to provide for an election by ballot, if called for by a majority of the voters present. Otherwise, the number would have been prescribed. Gen. Sts. c. 15, s. 14; Sts. 1864, No. 17.

The opinion of the court was delivered by

BARRETT, J.  The results required by the law in these cases depend on the results of fact from the evidence that is before the court. Without developing a critical analysis and collation of the evidence, the result is, that we find that Mr. Harris was not elected moderator of the village meeting. If the ballots gathered should be regarded as not having been fraudulently cast in any respect, nor fraudulently counted, we agree that Mr. Carpenter's vote was not lawful, for the reason that he was not a lawful voter

at that meeting. We agree that the votes for Carney, at the head of the seven tickets that contained votes for other officers, should have been counted. We find that one hundred and eighty-three votes were cast for Carney, besides the seven votes that were not counted for him. I am commissioned by my associates to give expression as follows to the views of the court, as to the manner in which the voting for moderator was done, and as to the manner in which it ought to have been done.

The crowd, the make-up, and the manner of the meeting are shown by the concurring testimony of most of the witnesses. The extent and vivacity of the excitement, the intensity of the purpose and determination on both sides of the partisan controversy each to carry it against the other, are vividly exhibited by the evidence. In view of what is thus shown, it behooved all concerned, as citizens mindful of their duties as well as of their rights, to see to it that the vote should be taken in a way most likely to enable all lawful and no unlawful votes to be taken and counted. It is agreed that many were there besides lawful voters; that they were mixed indiscriminately in the crowd and were participating in the excitement and uproar that characterized the scene. It is obvious that in taking the votes in hats by the two tellers, making their way as they did amongst, and through, and over the crowd—one of them in part traversing the same region with his receptive hat that the other had just before traversed with his and taken the deposited votes, it was impossible for the tellers, or anybody but the individual voters, to know whether illegal voters did not contribute illegal votes to the contents of the hats, and utterly impossible to be known whether some voters, legal or illegal, did not deposit more than a single vote at the same time, or that a single voter did not put a vote or votes into both hats. However proper such a mode of voting may be on some special occasions, when the voters are few and are well known and reliable men, and the excitement of hostile interests is not operating to prompt to anything but fair and legal voting, and when it would at once be manifest if illegal votes should be cast, nothing that could be said upon the subject could make more palpable the gross impropriety of taking the vote on the occasion as it was done in this case. It

was but a burlesque and a mockery of all sensible and sober ideas of a ballot answerable to the lawful right of the citizen, and to the soundness with which the exercise of that right is hallowed in the speech, at least, of the demagogue, as well as of the ingenuous citizen. It is of no avail to say that it was difficult to take the vote in any other way. It would be in point and cogent to answer, that it better not have been taken at all, than to be taken as it was. It is at the bottom of all honest and just ideas of a proper vote, that some mode should be adopted by which it may be known by persons authorized to determine a questioned right to vote, what persons offer to cast votes, or to vote by voice or by count, that the right of any such may be challenged and properly determined, and that, in voting by ballot, it may, with all practicable certainty, be known whether more votes have been cast than there are legal voters to cast them. The difficulty of doing this on any given occasion, as, for instance, the one now in question, is the strongest reason why it should be done.

It is strongly indicated in this case that more than a single vote were deposited in the hats at the same time by the same hand. It seems very likely that votes were put in by persons not legal voters in the village meeting, besides Mr. Carpenter, who voted without fault, though without legal right.

While the doctrine of the books and cases, as to the effect of acquiescence is recognized as sound and salutary, when properly invoked and applied, in this case there was no such acquiescence as to countervail the effect of the failure to elect Mr. Harris by a lawful majority. In the excitement and confusion of the occasion, nothing seems to have been done with considerate deliberation on either side. After Mr. Harris was declared to be elected moderator, the subsequent proceedings involved no show of a thought or supposition of acquiescence on the part of those opposed to the election of Mr. Harris, whether on the score of the man, or of the manner of his election, either in his holding the office, or in his right to exercise it. What ensued on their part, was an effort to forefend against further disaster to themselves by a repetition of the means that had been successful against them in the election of moderator. And it is further to be remarked that

this is not a proceeding upon the relation of a private person. It is by the State represented by its official attorney. We regard the State, as representing every citizen of it, to be entitled to have this application regarded in behalf of both the rights and duties of every citizen, as well as in behalf of good order and public tranquility as related to those rights and duties.

As to the taste and relish which persons may have in respect to what is shown to have constituted the occasion and the scenes in question, we make no comment—leaving that to be regarded by each one according to his own ideas and preferences. It is only when such scenes and occasions are brought in question as affecting official tenure and the right and duty of administering public office, and the rights of citizens involved therein, that it is the province of the court to pronounce upon their character and effect.

It is not found that said Carney was elected moderator of said meeting. It is considered and adjudged that said Samuel F. Harris has no right to hold and exercise said office, and that he be ousted and removed therefrom, and that he pay the costs of said complaint and proceeding.

The two other cases stand for the same consideration. For the election of clerk and trustees no ballot was taken, though called for in various ways, and by motion made and seconded, but not put to vote. Instead thereof, in pursuance of a motion and voice vote of *yea* and *nay* by acclamation, the moderator appointed a committee to nominate men for those and the other offices of the village corporation. That committee reported candidates for each of those offices. A motion was made, and the moderator put it to vote in the same manner as the motion aforesaid, that said report be accepted and adopted. The vote having been given, the moderator declared that said report was accepted and adopted, and that the several persons so nominated were elected to said offices for the year ensuing, which said persons accepted and have since been exercising the same. After said report had been made, and before said motion for its acceptance and adoption had been put, distinct calls and demands for an election by ballot were made by legal voters in said meeting, which the mod-

erator heard and understood to be made in the exercise and asser-
tion of the right to have the election made by ballot, as claimed
by those making the calls and demands. It was the lawful right
of the lawful voter to make such demand, and it was the lawful
duty of all concerned to have that right recognized and accorded
by having the election proceed by ballot. It is the right of the
individual voter under the charter to have such ballot upon his
demand, when heard and understood by the presiding officer.
Section 3 of the charter reads: " At every annual meeting said
corporation shall, by ballot, if called for, elect for the ensuing
year, and until their places are filled by due elections", the offi-
cers named. This does not prescribe any number as necessary to
make the call, in order to entitle it to be heeded, nor any manner
in which such call is to be made. It is left upon the simple and
unrestricted meaning and force of the language used ; and that
is, that whenever a voter calls for and demands a ballot, so that
the moderator hears and understands him, only by ballot can a
lawful election be made.

This does not necessarily imply that the officers must be voted
for, each upon a separate and single ballot, and in succession one
after another. Even if it were so, the fact that it would require
a long time to do it, and the proceeding would become tedious
and wearying, would not avail against the right and duty to have
the voting so done. In the absence of any provision or require-
ment in the statute in this respect, it does not occur to us that it
would not be competent for the meeting to direct by vote properly
taken, that all the officers to be elected at that meeting, or a part
of them, as might be deemed most proper and expedient, should
be voted for together on the same ballot, in a manner similar to
that in which state and county officers are voted for. This would
give each voter the right and opportunity to cast his vote for the
very man of his choice for each office, by making up his ballot
with the names of such men. After the ballots had been taken,
the votes for each man for any named office would have to be as-
sorted from the rest, and counted by themselves, the same as if
they had been cast separately and in no connection with any other
names on the ballot as it was put into the box. Whether an en-

tire ticket embracing all the officers to be elected had been nom-
inated or not, as was done in this case, the vote by the use of bal-
lots embracing all or any part, would have left each voter to
select his man for each office, in making out the ballot by him
to be cast.   This could not be done, as the vote was taken in this
case.   The vote of each voter had to be for or against the whole
or none.   Often, in case of voting by ballots containing names for
several different offices, constituting what is called the regularly
nominated ticket, some persons desire to vote for some of the nom-
inees and against the rest, and for somebody else in their stead.
This they can do by scratching, as the modern expression is, and
putting other names, or no name, in place of the scratched.   This
right, privilege, and practice cannot be exercised when the elec-
tion is made, as was attempted in this case, by a voice vote upon
the entire ticket made up by the nominating committee.   This
right, privilege, and practice every voter is entitled to, and
nobody can lawfully deny to him the free enjoyment and exer-
cise of them.   It in no manner meets the point, as against
such right, privilege, and practice, to say that the mode of elec-
tion adopted in this case had been used in previous elections.
When not challenged and brought in question, there was no
occasion for denying or testing its legality.   But the fact of not
bringing it in question by denying its legality, does not render
that mode legal, when it is questioned and denied, as was done in
the present instance.   Acquiescence in an unlawful mode at for-
mer meetings does not bind, as by a law, to the same mode at the
next, or any subsequent meeting.   When the lawful mode is re-
quired and demanded, no one is estopped from having it accorded,
and no one is authorized to refuse to accord it, by the fact that
some other mode, not prescribed or warranted by law, had been
adopted and practiced without challenge in making former elections.
This is not a subject for the loss of right by *non-user* or acquies-
cence, or the gaining of a right by adverse use.   While, under some
circumstances, the voter may not be heard to challenge the validity
of an election made in a mode in which he has participated and
acquiesced, he is not thereby precluded from challenging that
mode, and denying its legality, when a succeeding election is to

occur; and if such mode is not warranted by the law, it derives no warrant, in point of legality, from the previous adoption and use of it.

It is considered and adjudged that said·Merritt B. Morgan was not elected to, and has no right to hold and exercise, the office of clerk of said village corporation by virtue of said pretended election made at said meeting on the first Monday in April, 1879; and that said pretended election was of no effect, and is void; and that he be ousted and removed therefrom, unless he has otherwise lawful right and warrant for holding and exercising said office; and that he pay the costs of said complaint and proceeding.

It is considered and adjudged that said Robert W. Bennett, Daniel Guiltinane, Andrew M. Johnson, Frank Cromack, Charles A. Hawks, David F. Squires and Merritt B. Morgan, were not, nor was either of them, elected to, and have no right to hold and exercise, the office of·trustees or trustee of the corporation of the village of Bennington aforesaid, by virtue of said pretended election made at said meeting on the first Monday in April, 1879; and that said pretended election was of no effect, and is void, and that each of them be ousted and removed from said office, unless he has otherwise lawful right and warrant for holding and exercising said office; and that they pay the costs of said complaint and proceeding.